```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
         ASHEVILLE DIVISION
           1:15-cv-262-FDW
```

| | |
|---|---|
| RICARDO EDWIN LANIER, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| HENDERSON COUNTY DETENTION ) | |
| CENTER, et al., ) | |
| ) | |
| ) | |
|     Defendants. ) | |
| _____ ) | |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendants Christy Adams, Linda Corn, Brian Helton, Neil McDonald, and Jim Player, (Doc. No. 83). Also pending before the Court is a Motion to Strike Surreply, filed by the moving Defendants, (Doc. No. 87).

## I.     BACKGROUND

### A.     Procedural Background

Pro se Plaintiff Ricardo Lanier, a North Carolina inmate currently incarcerated at Albemarle Correctional Institution in Badin, North Carolina, filed this action, under 42 U.S.C. § 1983, on November 25, 2015, after he was assaulted by fellow inmates Kendall Rudisill and Deshawn Perry on October 20, 2015, while Plaintiff was a pre-trial detainee at the Henderson County Detention Center ("the Jail").

On November 30, 2015, this Court dismissed Plaintiff's complaint without prejudice because the only named Defendants were the Henderson County Detention Center and "Jail

1

officials." (Doc. No. 4). Plaintiff filed a First Amended Complaint on December 14, 2015, alleging claims of failure to protect, deliberate indifference to serious medical needs, and unconstitutional conditions of confinement against the Henderson County Detention Center, Henderson County Sheriff's Office employees Jim Player, Brian Helton, Neil McDonald, Linda Corn, and Flora Hernandez, a nurse at the Jail. (Doc. No. 8).

On March 18, 2016, on initial review, this Court held that Plaintiff sufficiently stated a failure-to-protect claim against Helton, McDonald, and Corn, a conditions-of-confinement claim against Player, and a deliberate indifference claim against Hernandez. (Doc. No. 16). The Court subsequently granted a motion to dismiss filed by Hernandez, and Hernandez was dismissed as a Defendant. (Doc. No. 57).

On November 29, 2016, Plaintiff amended his complaint to add a failure-to-intervene claim against Helton and Henderson County Sheriff's office employee Christy Adams. (Doc. Nos. 45, 58). This Court entered a scheduling order on January 11, 2017, setting the deadline for dispositive motions as June 11, 2017.

On June 9, 2017, Defendants Adams, Corn, Helton, McDonald, and Player filed the pending summary judgment motion. (Doc. No. 83). In their summary judgment motion, Defendants Corn, Helton, and McDonald contend that they are entitled to summary judgment on the failure-to-protect claim because they had no knowledge that Rudisill and Perry posed a threat to Plaintiff. Defendant Player contends that he is entitled to summary judgment on the conditions-of-confinement claim because he placed Plaintiff in a booking cell used to monitor injured inmates on orders of the Jail medical staff. Adams and Helton contend that they are entitled to summary judgment on the failure-to-intervene claim because they had no opportunity to intervene in the assault against Plaintiff. Defendants have attached the following documents

to their summary judgment motion: excerpts from Plaintiff's deposition taken on April 28, 2017, the sworn Declarations of each of the moving Defendants, as well as by Defendants' counsel Sean Perrin, and two CDs containing video footage of the assault incident and events leading up to the assault incident.

On August 14, 2017, this Court entered an order in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motion for summary judgment and of the manner in which evidence could be submitted to the Court. (Doc. No. 91). Plaintiff has responded to the summary judgment motion. <u>See</u> (Doc. Nos. 84, 93). Attached to Plaintiff's response are his sworn Declaration, as well as his deposition, and other exhibits obtained during discovery from Defendants. This matter is therefore ripe for disposition.

    **B.**    **<u>Factual Background</u>**

**1. Plaintiff's Relationship with Inmates Rudisill and Perry While a Pre-trial Detainee at the Henderson County Detention Center before the Assault**

On August 1, 2015, Plaintiff was incarcerated as a pre-trial detainee at the Henderson County Detention Center on pending charges. (Doc. No. 83-2 at 23:2-4, 20-22; 25:17-20: Pl. Dep.). At some point before being assaulted, Plaintiff was cellmates with Kendall Rudisill for a "couple of days, maybe a week at the most" until a week before the October 20th incident. (<u>Id.</u> at 26: 20-23, 27:1-2; 35:3-4, 18-20). Rudisill then moved to Deshawn Perry's cell because Plaintiff and Rudisill were not "get[ting] along with each other," although they weren't in the cell "about to fight each other. It wasn't like that." (<u>Id.</u> at 27:7-9; 35:23-24; 36:1-2). Indeed, both during their time as cellmates, as well as after the time they were cellmates, Plaintiff and Rudisill never fought one another until the incident on October 20. (<u>Id.</u> at 36:15-17). Plaintiff "never had

3

problems with anybody in there, in that cell block at all." (Id. at 40:18-19). Plaintiff stated "[t]he whole time I was in that pod I've got along with everybody." (Id. at 40:23-24). There is also no indication that Rudisill and Perry were violent inmates. When asked about them, Plaintiff stated that he didn't remember them "getting into it the whole time I was there" or assaulting other inmates. (Id. at 40:25; 41:1-12).

Like Plaintiff, the moving Defendants had no knowledge of any prior assaults committed by Rudisill and Perry against any other inmates. (Doc. No. 83-3 at ¶ 10: Corn Decl.; Doc. No. 83-4 at ¶ 6: Helton Decl; Doc. No. 83-5 at ¶ 8: McDonald Decl.). Plaintiff and Rudisill would also routinely play cards with one another, along with Perry and another inmate. (Doc. No. 83-2 at 37: 3-7; 39:17-21). Almost every day, the group would play "spades . . . the whole rec period. That's how we would pass our time by." (Id. at 37:12, 20-21, 41:16). In fact, the "majority" of Plaintiff's free time was spent playing cards with Rudisill, Perry, and the other inmates. (Id. at 42:1-2). The group never fought or argued while playing spades, and officers would see them playing spades. (Id. at 37:23-25; 38:1-6). After the card games ended, Plaintiff stated that "sometimes we would sit there and we would talk and laugh because we weren't on bad terms until this incident… We was all all [sic] right. To my knowledge we were." (Id. at 42:20-25).

**2. On October 20, Plaintiff Leaves His Cell, Receives His Dinner Tray, and Is Threatened By Perry**

During meal time, an inmate's door is opened and all inmates come downstairs to get a tray, and take it back to their cell to eat. (Doc. No. 83-2 at 30:16-25). On October 20, 2015, Helton and McDonald were serving trays to the inmates. (Doc. No. 83-4 at ¶ 4; Doc. No. 83-5 at ¶ 4). At 5:00 p.m., Plaintiff left his cell, HD212, the fourth cell on the top left, and walked downstairs to receive a dinner tray. (Doc. No. 83-6 at ¶ 16: Jim Player Decl.). According to

4

Plaintiff, when he was going downstairs to get his food for dinner, Perry started "talking junk and I was talking junk back to him." (Doc. No. 83-2 at 33:12-16; 43:6-8). Perry was walking up the stairs back to Perry's cell when he told Plaintiff "I'll kill you." (Id. at 44:12-13; 16-17). Plaintiff responded, "You're not going to kill blank, blank, blank, blank because there's more than one." (Doc. No. 83-2 at 44:17-24). According to Helton and McDonald, they did not hear any threats. (Doc. No. 83-4 at ¶ 4; Doc. No. 83-5 at ¶ 6).[1] Plaintiff is unclear what precipitated Perry's comment because there were no threats before it, and he was on good terms with both Perry and Rudisill. (Doc. No. 83-2 at 47:17-21).

Plaintiff didn't "pay attention" to Perry's threat. (Doc. No. 83-2 at 72:2). In fact, he "didn't actually know that they were going to actually—how can I try—try to follow through with it or follow through with it." (Id. at 141:5-7). Plaintiff "didn't take serious, what they were saying." (Id. at 57:13-14). Plaintiff elaborated on how he construed Perry's comments: "When I was saying I didn't take it serious, it's not that I didn't take it serious. I thought—that's the exact way. I thought we were just words…because when you get mad, you say things." (Id. at 141:13-16, 18-19).

At 5:29, Plaintiff received his dinner tray. (Doc. No. 83-6 at ¶ 16). A bun was missing from Plaintiff's tray, so he was told to have a seat while Helton and McDonald went to get him an extra hotdog bun. (Doc. No. 83-2 at 48:9-11). Helton and McDonald left the housing area at 5:58. (Doc. No. 83-6 at ¶ 16). Plaintiff, Rudisill, and Perry began arguing after Helton and McDonald left. (Doc. No. 83-2 at 48:15-17). No officers were present during this argument. (Id. at 48:21-24).

---

[1] Plaintiff claims that they heard the threats, but he offers no evidence in support of this claim other than his statement that they "looked at us both." (Doc. No. 83-2 at 66:25; 67:1).

5

According to Plaintiff, "theoretically they were probably threatening me or disrespecting me. I can't quote/ unquote recite what they were saying, but they were talking junk because if they weren't—if they weren't talking junk, I wouldn't be talking back to them." (Doc. No. 83-2 at 49:1-6). The argument stopped when the officers came back. (Id. at 49:14-24). At 5:02:50 McDonald came back to the medium housing unit. (Doc. No. 83-6 at ¶ 17). When he entered the Pod, McDonald heard Plaintiff talking loud. (Doc. No. 83-5 at ¶ 5). McDonald asked Plaintiff what was going on, and Plaintiff did not respond. (Id.). Corn, who was near the female housing unit, came in with McDonald. (Doc. No. 83-3 at ¶ 4). Corn asked Plaintiff what was going on, and he did not respond. (Id. at ¶ 5).

After receiving his bun from McDonald, Plaintiff went back to his cell. (Doc. No. 83-2 at 50:10-11, 18-23). Corn then asked the inmates on the second floor what was going on, and nobody responded. (Doc. No. 83-3 at ¶ 6). An inmate on the second floor stated that somebody was having a heart attack. (Id.). Corn asked who, but nobody responded. (Id.). At 5:03:07, Corn went upstairs to talk to the inmates on the second floor. (Doc. No. 83-2 at 53:2-7). Corn questioned the occupants of cells HD 205-208, and walked upstairs and talked to all the cells on the upper right side. (Doc. No. 83-3 at ¶ 7). After questioning the occupants, and not getting a response, Corn left the pod at 5:04:12. (Id. at ¶ 8).

### 3. Inmates Rudisill and Perry Attack and Assault Plaintiff

About 45-50 minutes later, when the inmates finished their meals in their cells, the cell doors were unlocked for inmates to place their trays downstairs. (Doc. No. 83-2 at 55:2-10, 23-25; 56:1). When he went to put his tray away at 5:51:21, Plaintiff passed Rudisill and Perry's cell, but they did not say anything to him. (Id. at 55:11-13; Doc. No. 83-6 at ¶ 19). Plaintiff also didn't say anything to Rudisill and Perry at this time. (Doc. No. 83-2 at 61:7-8). After putting

6

his tray away, Plaintiff sat on a table and saw Rudisill and Perry by the phone. (Id. at 55:19-22). Instead of going back to his cell, Plaintiff stayed out in the common area "because I didn't think—I didn't think they were going to follow through with what they said. You know, people talk all the time." (Id. at 56:17-19).

At this time, a Sheriff's Officer, Vicky Moore, was ten feet away from Plaintiff, but Plaintiff didn't mention anything to her because "people argue all the time . . . I didn't know that they were going to actually try to kill me." (Id. at 59:12-25, 182:13-18). Plaintiff "didn't know I needed help at that time." (Id. at 60:6-8). After Moore finished her rounds, Plaintiff went to his cell to take a shower. (Id. at 61:2-3).

Plaintiff saw Perry walk up the stairs towards Plaintiff's cell, but "I'm not really paying him any attention because I'm not thinking he's coming to me because he's not talking to me as he's coming up the stairs." (Id. at 61:15-16). Another inmate, Timothy Waters, attempted to block Perry, but Waters got out of the way when he saw Rudisill with a broom. (Id. at 61:18-25; 62:1-5).

Rudisill then came into Plaintiff's cell and started hitting him with a broom. (Id. at 62:9-11). Plaintiff didn't know that they were going to assault him and was "completely . . . taken aback" that they did. (Id. at 146:6-9, 15-18). Plaintiff defended himself by hitting Perry, (id. at 67:19-25), and by trying to get the broom from Rudisill. (Id. at 68:3-5). Rudisill then grabbed Plaintiff, (id. at 69:12-13), and Perry grabbed Plaintiff's foot, and threw him over the railing, thirteen-and-a-half feet from the floor. (Id. at 70:4-6, 16-17). Plaintiff held on to the railing and dropped. (Id. at 71:4-8). As a result of the fall, Plaintiff fractured his foot. (Id. at 73:6-9). The video footage of the incident shows that the assault and ensuing fight lasted about two minutes.

Officers responded and broke up the fight. (Id. at 73:25, 74:1). Plaintiff was taken by

7

wheelchair to see medical staff. (Id. at 76:16-25, 78:6-13). As a result of his injuries, jail medical staff requested that Plaintiff be placed in a booking cell for about two weeks so that prison officials could observe him.² (Id. at 83:6-9; 86:22-25; Doc. No. 83-6 at ¶ 6). Plaintiff complained to Jim Player about being in the cell due to excessive lighting and having to sleep on the floor, (Doc. No. 8 at p. 4), and Player said "because of the mobilization boot, medical has placed you in here and he said this is procedure." (Doc. No. 83-2 at 84:3-5). Plaintiff acknowledged that he was placed in booking because medical wanted him there for added observation. (Id. at 92:4-9).

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather,

---

² When Plaintiff's condition improved, he was moved to another cell with a bed. Plaintiff states in his deposition that he is complaining only about the initial two weeks when he was kept in the booking cell. (Doc. No. 93-3 at 87:13-17).

the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, the non-movant must show the existence of a factual dispute on every essential element of his claim.

### III. DISCUSSION

**A. Plaintiff's Failure-to-Protect Claim Against Defendants Corn, Helton, and McDonald**

The court first addresses Plaintiff's failure-to-protect claim against Defendants Corn, Helton, and McDonald. A failure-to-protect claim requires proof of two elements to establish the deprivation of a constitutional right. Farmer v. Brennan, 511 U.S. 825, 834 (1994); accord

Brown v. N.C. Dep't of Corr., 612 F.3d 720, 721-23 (4th Cir. 2010).[3] First, a plaintiff must establish a serious deprivation of his rights in the form of a "serious or significant physical or emotional injury." Brown, 612 F.3d at 723. Second, a plaintiff must show that the defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. In this context, the required state of mind that must be established is a "deliberate indifference to inmate health or safety." Id. (citations omitted). A plaintiff can establish "deliberate indifference" by showing that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Id. at 837. Deliberate indifference is "a very high standard." Grayson v. Peed, 195 F.3d at 695. To meet this standard, a plaintiff must show that the defendant had actual knowledge of an excessive risk to his safety, which may be proven by circumstantial evidence that a risk was so obvious that it had to have been known. See Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015).

The Court finds that Defendants Corn, Helton, and McDonald are entitled to summary judgment as to Plaintiff's failure-to-protect claim. First, the undisputed evidence on summary judgment, particularly through Plaintiff's statements made in his own deposition, shows that not even Plaintiff—who described Rudisill and Perry as card partners with whom he spent much of his free time—knew that Rudisill and Perry were threats to his safety.[4] (Doc. No. 83-2 at 37:23-

---

[3] Although Plaintiff's failure-to-protect claim is based on the Fourteenth Amendment because he was a pre-trial detainee at all relevant times, Eighth Amendment cases are instructive in assessing deliberate indifference Fourteenth Amendment claims. Evans v. City of Sumter, S.C., No. 3:07-2688-JFA-JRM, 2008 WL 4177225, at *5 n.4 (D.S.C. Sept. 3, 2008) ("Because both the Fourteenth Amendment's Due Process Clause and the Eighth Amendment address the permissibility of punishment, decisions addressing the dimensions of the Eighth Amendment's prohibition of cruel and unusual punishment provide[] guidance for analysis under the Due Process Clause in several respects."); but see Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 2475 (2015) (adopting an objective reasonableness test for excessive force claims by pretrial detainees).

[4] In his materials opposing the summary judgment motion, Plaintiff points to various statements in his deposition that he insists must be corrected because they are not accurate and not what he

25; 42:20-25). There is also no evidence to suggest that Corn, Helton, and McDonald knew something that Plaintiff didn't—that Rudisill and Perry were going to attack Plaintiff. In fact, Plaintiff candidly admitted in his deposition that he had no idea he was going to be attacked until Rudisill hit him with a broom. For instance, when asked why he didn't lock his cell immediately before the attack, he responded:

> Why would I went in my cell, though, because they made those threats and they didn't do nothing about it. If they didn't do anything about it, what I am supposed to do?...Why would I go back to my cell and lock it if they didn't do anything about the threats that they heard that you saw on the video?

(Doc. No. 83-2 at 184:8-19).

Second, Plaintiff's actions after receiving the threats also indicate that he did not believe Rudisill and Perry posed a threat to his safety. Plaintiff never told any of the officers who were present during the Perry threat (Helton and McDonald) that he was afraid. (Doc. No. 83-4 at ¶¶ 7-8); Doc. No. 83-5 at ¶¶ 8, 10). Even after arguing with Rudisill and Perry while the officers were gone, Plaintiff never told Corn or McDonald that he feared for his safety. (Doc. No. 83-3 at ¶¶ 5, 12; Doc. No. 83-5 at ¶ 5). Forty-five minutes later, and about one minute before the fight, after putting his tray down, Plaintiff had the opportunity to tell Officer Moore about his fear, but he failed to do so because he "didn't know he needed help at that time." (Doc. No. 83-2 at 59:15-25; 60:8; Doc. No. 83-6 at ¶¶ 19-20).

In addition to not telling any officers about the threats, Plaintiff didn't lock his cell door or press the call button immediately before the attack. (Doc. No. 83-2 at 62:15-22; 63:5-10; 147:3-4; Doc. No. 83-6 at ¶ 21). The undisputed evidence presented on summary judgment

---

stated. See (Doc. No. 93-4). Plaintiff has offered nothing to show that the court reporter at Plaintiff's deposition incorrectly transcribed his statements.

shows that Plaintiff did not perceive any risk of harm from Rudisill and Perry until the surprise attack. (Doc. No. 83-2 at 146:15-17). As Plaintiff described his state of mind immediately before the attack: "If you're saying I could have gone in my cell and locked the door, like I said, them boys had made those threats. I'm not thinking nothing. I sat on that table. The man didn't come over there to me. I'm not thinking nothing of that situation. I'm going upstairs and I'm about to take a shower." (Doc. No. 83-2 at 187:16-21).

Third, Defendants Corn, Helton, and McDonald have all attested that none of them had any idea that Rudisill and Perry, based on their past history, posed a risk of harm to Plaintiff. (Doc. No. 83-3 at ¶ 11; Doc. No. 83-4 at ¶ 7; Doc. No. 83-5 at ¶ 8). Plaintiff had been at the Jail since August 1, 2015, and he not been involved in any confrontations with Rudisill or Perry, nor had he informed Corn, Helton, or McDonald about any problems he had with Rudisill and Perry. (Id.). Plaintiff never informed Defendants Corn, Helton, and McDonald that Rudisill and Perry threatened him, or that Plaintiff feared them. (Doc. No. 83-3 at ¶ 12; Doc. No. 83-4 at ¶ 8; Doc. No. 83-5 at ¶ 10). In fact, the officers assumed that Plaintiff, Rudisill, and Perry were all friends after seeing them playing cards together on a regular basis. See (Doc. No. 83-2 at 37:25; 38:1-6). In other words, this case simply does not involve a long-standing history of threats or violence between inmates that might give rise to imputed knowledge of a threat. Cf. Makdessi v. Fields, 789 F.3d at 133 (stating that a prison official's actual knowledge can be shown by evidence that risk of inmate attacks was "longstanding, pervasive, [and] well-documented").

Fourth, the only threat allegedly made in the presence of the officers—Perry's threat—lasted about eleven seconds. Plaintiff admits that this eleven-second threat was the only one made in front of any Defendants:

Q: Okay, But, again, the only threats that Rudisill and Perry made in the presence of

officers were when they were walking up the stairs, which you just looked at; right?

A: Oh, yes. Yes.

(Doc. No. 83-2 at 177:22-25; 178:1). Moreover, only Helton and McDonald were in the pod during this eleven-second period, they were serving food to inmates, and they both deny hearing this threat. (Doc. No. 83-4 at ¶ 4; Doc. No. 83-5 at ¶¶ 4, 6). Significantly, Plaintiff received his dinner tray from Helton and McDonald, just twenty-two seconds after allegedly being threatened, and his only comment to them was that he needed a new hot dog bun. (Doc. No. 83-6 at ¶ 16).

Fifth, after hearing yelling in the pod when McDonald returned with Plaintiff's bun, both Corn and McDonald tried to investigate the source of the yelling.[5] Plaintiff did not answer Corn or McDonald's questions, and Corn attempted to determine the source of the arguing when she talked with the inmates on the second floor. (Doc. No. 83-3 at ¶¶ 6-7). No one informed her about any problems, so she left the pod. (Id. at ¶¶ 7-8).

In sum, as Plaintiff has failed to demonstrate that Corn, Helton, and McDonald knew of and disregarded an excessive risk to Plaintiff's health or safety, these Defendants are entitled to summary judgment as to his failure-to-protect claim. Moreover, Plaintiff fails, in his materials opposing summary judgment, to raise a disputed issue of material fact as to his failure-to-protect claim against these Defendants. Notably, Plaintiff's mere speculation, without any supporting evidence, that Defendants must have heard the threat from inmate Perry is not enough to withstand summary judgment.[6] See Morris v. Collins, 371 Fed. Appx. 509, 511 (5th Cir. 2010)

---

[5] By that point, Helton had left the pod. (Doc. No. 83-4 at ¶¶ 4-5: Helton Decl.).
[6] Moreover, when McDonald heard loud arguing after he came back from retrieving a new hot dog bun for Plaintiff at around 5:03, he asked Plaintiff about the yelling, and Plaintiff failed to respond. As Defendants note, to speculate that McDonald heard a threat but failed to respond is

13

(unpublished) (finding that the plaintiff inmate's "conclusional assertion that [the defendant officer] heard the alleged threat from [the inmate who assaulted the plaintiff inmate] is not within [the plaintiff inmate's] personal knowledge and, therefore, does not constitute competent summary judgment evidence"); accord Leatherwood v. Cohen, No. 8:10-cv-1593, 2011 WL 4435815, at *9 (D.S.C. Apr. 29, 2011) (unpublished) (granting summary judgment to the defendants as to the plaintiff's failure-to-protect claim, where the plaintiff presented no evidence that the defendants drew or could have actually drawn the inference that there was a substantial or excessive risk that another inmate could seriously harm the plaintiff); Fennell v. Williams, No. 1:09cv2429, 2011 WL 251464, at *5 (D.S.C. Jan. 5, 2011) (unpublished) (dismissing deliberate indifference claim where there was "no evidence that Defendants knew of a specific risk of harm to him and consciously disregarded it"); Brooks v. Bufford, No. 2:10cv689, 2011 WL 2119281, at *7 (D.S.C. Mar. 3, 2011) (unpublished) (stating that "[o]ther than the Plaintiff's conclusory allegations, the Plaintiff offers no evidence that the Defendants knew or should have known that the other inmate posed a risk to the Plaintiff's safety").

In sum, for the reasons stated herein, Defendants Corn, Helton, and McDonald are entitled to summary judgment as to Plaintiff's failure-to-protect claim.

**B. Plaintiff's Failure-to-Intervene Claim against Defendants Christy Adams and Brian Helton**

Plaintiff also claims that Adams and Helton are liable to him because both worked at the control booth and they may have observed inmates Rudisill and Perry assaulting Plaintiff, but failed to intervene and warn other officers. (Doc. No. 83-2 at 114:21-25; Doc. No. 8 at 2). For

---

inconsistent with his actions three minutes later when he heard the loud arguing.

the following reasons, Defendants Adams and Helton are entitled to summary judgment as to Plaintiff's failure-to-intervene claim.

To prevail on a theory of failure to intervene under Section 1983, Plaintiff must demonstrate that Adams and Helton (1) knew Plaintiff's rights were being violated; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act.[7] Randall v. Prince George's Cnty., 302 F.3d 188, 204 (4th Cir. 2002). The Fourth Circuit has further recognized that the officer must have "specific knowledge" of the unconstitutional act. Id. at n.24. The undisputed evidence on summary judgment shows that neither Adams nor Helton had this required knowledge.

First, Adams states in her Declaration that she was assigned to the central control booth during the fight, and her main job duty was to maintain a secure housing control center, including the opening of cell doors in male housing units, and coordinating movement of male inmates for meals, recreation, and programs. (Doc. No. 83-7 at ¶ 3: Christy Adams Decl.). From the central control booth, there is no direct observation into Plaintiff's pod, the medium housing unit. (Id. at ¶ 4). Adams asserts that the first time she became aware of the fight was when she heard a call from Officer George Mayo. (Id. at ¶¶ 5, 6). After receiving the call from Officer Mayo, she pulled up the video from the medium housing unit on the computer screen and observed officers entering the cell. (Id.). Adams states that if she had been aware of the fight, she would have called out for help just like Mayo. (Id.).

Next, as for Helton, he asserts in his Declaration that he was preparing to replace Adams

---

[7] The Fourth Circuit uses "failure to intervene" interchangeably with "bystander liability." See Dodson v. Prince George's Cnty., No. 13cv2916, 2016 WL 67255, at *3 (D. Md. Jan. 6, 2016) (unpublished).

in the central control booth when Mayo radioed about the fight. (Doc. No. 83-4 at ¶ 5). When Adams pulled up the fight on the computer, Helton observed officers entering the medium housing pod. (Id.). For the duty to intervene to arise, Adams and Helton must have had a reasonable opportunity to realize the fight was occurring and a realistic opportunity to stop it. See Randall v. Prince George's Cnty., 302 F.3d at 204. The undisputed evidence on summary judgment shows, however, that neither Adams nor Helton had the opportunity to intervene in the fight. In fact, the first time that they were aware of the fight was when Officer Mayo called for help on the radio, and Adams pulled it up on the computer screen in the central control booth. Plaintiff's speculation—in his deposition, and in his Declaration in opposition to the summary judgment motion—that Defendants Adams and Helton may have seen the fight from the control booth right when it started, is simply not enough to withstand summary judgment.[8]

In sum, for the reasons stated herein, Defendants Adams and Helton are entitled to summary judgment as to Plaintiff's failure-to-intervene claim.

**C. Plaintiff's Conditions-of-Confinement Claim against Defendant Jim Player**

Plaintiff next claims that Defendant Player violated his Fourteenth Amendment rights by placing him initially in a booking cell, where he had to sleep on the floor, with only a mattress and blanket, and with a bright light shining in the cell.[9] (Doc. No. 8 at p. 4). In a conditions-of-confinement claim, a plaintiff must allege facts demonstrating the serious deprivation of a basic human need (the objective prong) and deliberate indifference to the jail conditions by the

---

[8] Nor does Plaintiff's alternative contention—that Adams and Helton would have observed the fight if they had been paying attention as they should have been in the control booth, and they were, therefore, somehow negligent in their conduct—raise a genuine dispute of material fact as to whether Defendants Adams and Helton are liable on a theory of failure to intervene.
[9] Plaintiff admitted in his deposition that he had a mattress. (Doc. No. 83-2 at 82:7-10).

defendant (the subjective prong).[10] Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993). As for the objective prong, "extreme deprivations" are required to make out a conditions-of-confinement claim. Hudson v. McMillian, 503 U.S. 1, 8-9 (1992). To show an extreme deprivation, a prisoner "must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions," Strickler v. Waters, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions, see Helling v. McKinney, 509 U.S. 25, 33-35 (1993).

The Court finds that Player is entitled to summary judgment on Plaintiff's Eighth Amendment conditions-of-confinement claim. Here, the evidence shows that Jail medical staff examined Plaintiff after Perry and Rudisill assaulted him. (Doc. No. 83-6 at ¶ 5). Plaintiff could not walk after this assault, (Doc. No. 83-2 at 85:5-6), and the medical staff diagnosed him with a fractured left foot. (Doc. No. 83-6 at ¶ 5). Medical staff also gave Plaintiff a "full boot immobilizer" to place on his left foot for approximately four weeks. (Id.). Based on this diagnosis, the Jail medical staff requested that Plaintiff be placed in a booking cell specifically for inmates who have severe injuries or medical conditions, in order to observe him in a direct supervision setting. (Id. at ¶ 6). Moreover, medical staff requested that Plaintiff stay in this cell until his mobility improved for his protection. (Id. at ¶ 7). The cell Plaintiff was placed in complied with jail standards. It had a toilet and sink, with hot and cold water; a state-approved mattress in an approved protective floor boat designed for individuals with leg injuries; and

---

[10] As with his failure-to-protect claim, since Plaintiff was a pretrial detainee at all relevant times, his claim is properly brought under the Fourteenth Amendment's due process clause, rather than under the Eighth Amendment's cruel and unusual punishment clause. See Bell v. Wolfish, 441 U.S. 520, 535-38 (1979). However, courts may rely on the standards applied in Eighth Amendment conditions-of-confinement cases in assessing cases arising under the Fourteenth Amendment for pretrial detainees.

17

lighting and a full glass front for observation by jail and medical staff. (Id. at ¶ 8). Plaintiff was also given a blanket and sheet. (Id.).

After receiving complaints from Plaintiff about the cell, medical staff told Plaintiff he needed to remain in the cell until cleared by medical. (Id. at ¶ 10). When medical staff determined that Plaintiff was more mobile and able to take care of himself around other inmates, he was moved to a different cell. (Id. at ¶ 11). Here, the evidence on summary judgment shows that, in being placed in the booking cell for observation for the first two weeks after his injury, Plaintiff was not subjected to inhumane conditions in the cell rising to the level of a Fourteenth Amendment violation.[11] See Cash v. Thomas, No. 6:12-1278-MGL, 2013 WL 3804375, at *8 (D.S.C. July 19, 2013) (unpublished) ("Confinement in even administrative segregation for medical and security reasons does not violate a detainee's or prisoner's constitutional rights."); Singletary v. Dobey, No. 9:11-2658-MGL, 2013 WL 2285956, at *12 (D.S.C. May 23, 2013) (unpublished) (stating that plaintiff's unhappiness with being placed in the medical observation cell was not a constitutional violation, even assuming for purposes of summary judgment that the placement deprived him of some privileges or amenities he might otherwise have had if he was in the general population).

Furthermore, Player's reliance on the expertise of jail medical staff, and specifically their recommendation to place Plaintiff in the booking cell for observation, was reasonable. (Doc. No. 83-6 at ¶ 12). A jail official's "failure to take further action once he ha[s] referred the matter to

---

[11] In his Declaration in opposition to the summary judgment motion, Plaintiff disputes that the cell in which he was placed initially was actually a "medical observation" cell. See (Doc. No. 93 at 32). Regardless of whether the cell was technically a "medical observation" cell, the conditions in which Plaintiff was placed for observation in the cell did not violate his Fourteenth Amendment rights.

the medical providers can[not] be viewed as deliberate indifference." Greeno v. Daley, 414 F.3d 645, 655-56 (7th Cir. 2005). Plaintiff was placed in the holding cell because the Jail's medical staff requested that he be placed there due to his injuries. (Doc. No. 83-6 at ¶ 6). He was not removed from the cell until the Jail medical staff informed Player that it was medically safe for Plaintiff to be removed. (Id. at ¶ 11). Player was entitled to rely on the opinions of the Jail's medical professionals regarding Plaintiff's condition, absent evidence that he otherwise knew about and disregarded an excessive risk to Plaintiff's health and safety.[12] See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) (stating that prison officials are entitled to rely on the judgment of medical personnel); Shelton v. Angelone, 148 F. Supp. 2d 670, 678 (W.D. Va. 2001) (noting that "[p]rison personnel may rely on the opinion of the medical staff as to the proper course of treatment"); Strange v. O'Brien, No. 7:10-cv-151, 2010 WL 8750304, at *4 (W.D. Va. July 30, 2010) (unpublished) (stating that "[w]ithout any medical expertise of his own, however, [the defendant] rightfully relied on the professional judgments of his medical staff as to the appropriate course of treatment for [the plaintiff's] injured foot, and in so doing, was not deliberately indifferent to a risk of harm known to him").

In sum, for the reasons stated herein, Defendant Player is entitled to summary judgment as to Plaintiff's conditions-of-confinement claim.

### IV. CONCLUSION

For the reasons stated herein, the Court will grant summary judgment to Defendants and

---

[12] Indeed, as Defendants note, if Player had granted Plaintiff's wishes and ignored medical advice, he would be opening himself up to even greater liability. Layman ex. rel. Layman v. Alexander, 343 F. Supp. 2d 483, 491 (W.D.N.C. 2004) (detention officer who ignores doctor's instructions about bringing an inmate to the emergency room if he exhibited strange behavior, may be deliberately indifferent).

19

dismiss this action with prejudice.[13]

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 83), is **GRANTED**, and this action is dismissed with prejudice.

2. Defendants' Motion to Strike Surrreply, (Doc. No. 87), is **DENIED**.

3. The Clerk is directed to terminate this action.

Signed: November 6, 2017

Frank D. Whitney
Chief United States District Judge

---

[13] Defendants raised qualified immunity as a defense to Plaintiff's claims. Because the Court has determined that there was no constitutional violation in the first instance, the Court does not need to determine whether Defendants are entitled to qualified immunity. The Court observes, however, that even if the Court were to find that a genuine issue of dispute existed as to whether Defendants violated Plaintiff's constitutional rights, Defendants would be entitled to qualified immunity. See Berry v. Sherman, 365 F.3d 631, 634-35 (8th Cir. 2004) (officer entitled to qualified immunity where nobody, including the inmate plaintiff, believed that the inmate at substantial risk of harm of attack by another inmate).